UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

DAVID K. MILLER,

                              Plaintiff                    DECISION AND ORDER

-vs-
                                                          15-CV-6468 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.
_____

APPEARANCES

For the Plaintiff:            Christopher M. Mesh
                             Connors & Ferris, LLP
                             3445 Winton Place, Suite 112
                             Rochester, New York 14623

For the Defendant:            Rebecca H. Estelle
                             Tomasina DiGrigoli
                             Social Security Administration
                             Office of General Counsel
                             26 Federal Plaza, Room 3904
                             New York, New York 10278

                             Kathryn L. Smith
                             Office of the United States Attorney
                             for the Western District of New York
                             100 State Street
                             Rochester, New York 14614

INTRODUCTION

    This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of David K. Miller ("Miller" or "Plaintiff") for Social Security

Disability Insurance ("SSDI") benefits.  Now before the Court is Plaintiff's motion

1

(Docket No. [#7]) for judgment on the pleadings and Defendant's cross-motion [#12] for judgment on the pleadings.  Plaintiff's motion is granted, Defendant's cross-motion is denied and this matter is remanded for further administrative proceedings.

BACKGROUND

The reader is presumed to be familiar with the Parties' submissions, which contain  detailed recitations of the pertinent facts.  The Court has reviewed the entire administrative record and will offer only a brief summary of the facts contained therein.[1] Prior to 2010, Miller had worked for many years in "the music business" as a stagehand for various bands.  Later, Miller worked as an assistant stage manager for an orchestra and also assisted his wife with her restaurant business.

In December 2010, while Miller was working, he sustained a concussion when he slipped on ice in a parking lot and struck the back of his head on the pavement.  Miller was hospitalized for two days following the accident.   Subsequently, Miller complained of headaches, depression, anxiety, dizziness, poor concentration and memory, loss of interest in his family and increased irritability.

Following the injury, Miller was examined numerous times by his treating internist Richard Abbott, M.D. ("Abbot"), and his treating neurologist, Marc Schieber, M.D. ("Schieber").  In addition, Miller was evaluated on one occasion each by neurologist Thomas Rodenhouse, M.D. ("Rodenhouse"), neuropsychologist Krista Damann, Ph.D.,

---

[1] *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) ("To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.") (citation omitted). Of course, in discussing the entire record, the Court "keep[s] in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record."  *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998).

ABPP-CN ("Damann"), clinical- and neuro-psychologist Michael Baer, Ph.D., ScD ("Baer"), neurologist James Azurin, M.D. ("Azurin"),[2] agency consultative neurologist Harbinder Toor, M.D. ("Toor") and agency consultative psychologist Yu-Ying Lin, Ph.D. ("Lin").

On January 10, 2011, approximately one month after his concussion, Plaintiff told Abbott that he had returned to work on January 4th and was "having no problem performing his duties." (289).  Plaintiff reportedly stated that he was having "slow improvement," but still had "daily constant headaches rated 6/10 in severity,"  "mild photophobia" and some problems with sleep. (289).

On February 4, 2011, Plaintiff told Abbott that he was having severe headaches, photophobia and nausea. (284).  Plaintiff indicated that he spent much of his time in bed sleeping, and had little motivation.  Plaintiff's wife indicated that he seemed disengaged, unmotivated and lethargic, which was unusual. (284).  Plaintiff was still working, but had called in sick a few times.  Plaintiff felt depressed because he was not improving.  Abbott reported that Plaintiff's affect was flat, and that he was "obviously depressed and frustrated." (284).  Abbott's impression was "closed head injury with postconcussive syndrome," for which he prescribed amitriptyline and vicodin. (285).  Abbot noted that Plaintiff was working and was not "disabled from regular duties." (286).

On February 15, 2011, Rodenhouse examined Plaintiff, upon a referral from Abbott. (288).  Plaintiff complained of "intermittent headaches." (288).  Plaintiff reportedly told Rodenhouse that "he ha[d] no difficulty at work and [was] able to modify

---

[2]At page 11 of the ALJ's Decision she erroneously refers to Dr. Azurin as Dr. Azaria. (20)

his activities as symptoms dictate[d]." (288).  Rodenhouse conducted a neurological

exam that was essentially normal.  Rodenhouse opined that, "He has a post concussive

syndrome which I believe will eventually clear." (288).

On February 28, 2011, Abbott reported that Plaintiff was still complaining of

severe headaches, though the "frequency seem[ed] to [be] lessening," and his

"depression [was] clearly improved." (286).  Abbott remarked that Plaintiff's "mood [was]

definitely improved." (286) ("He appears much less withdrawn.  He is more alert and

brighter.").

On March 9, 2011, neurologist Dr. Azurin examined Miller at Rodenhouse's

request. (350-352).  Miller reportedly complained of headaches, depression, memory

loss, fatigue, anxiety, difficulty concentrating and possible seizures, though he also

indicated that his concentration had actually improved recently. (350).  Miller reportedly

"denie[d] all toxic habits." (351).  When Azurin initially asked Miller if he knew the date,

Miller quickly responded in the negative, but on further questioning he provided the

correct date, which caused Azurin to opine that there might be "a component of

intentionally poor effort." (352).  Azurin reported that Miller could follow commands and

remember two-out-of-three objects. (351).  Azurin opined that Miller had "slightly

abnormal mental status short-term memory," which "could be multifactorial in etiology,"

but which was probably due, at least in part, to the concussion. (352).  Azurin also

agreed with Abbot that Miller had a mood disorder, which could have been impairing his

attention and concentration.  Azurin also questioned whether Miller's memory problems

could have been caused by sleep apnea. (352)  However, in light of the possibility that

there might have been "a component of intentionally poor effort" on testing, Azurin

4

recommended that Miller have a further evaluation. (352).

On April 25, 2011, Plaintiff told Abbott that he was having "daily headaches rated 6/10 in severity," as well as fatigue, insomnia, dizziness, irritability and trouble concentrating. (282). Abbott noted that Plaintiff appeared "frustrated, depressed and fatigued." (282). Plaintiff indicated that he was working about 40% of his usual schedule. Abbott had prescribed a variety of pain medications, but Plaintiff claimed that they were not helping.

On August 8, 2011, Plaintiff reportedly told Abbott that he was continuing to have headaches, but did not feel depressed. (280). Plaintiff stated that he was having problems with concentration and short-term memory. (280).

On October 31, 2011, Abbott reported that Plaintiff was continuing to work, but was complaining of frequent headaches, ranging from 2/10 to 8/10 in severity. (278). Plaintiff indicated that he lacked motivation and felt irritable. Abbott reported that Plaintiff appeared "tired and depressed." (277). Abbott's diagnosis was "status post severe closed head injury - post concussive syndrome with depression and headache." (277).

On February 14, 2012, Abbott reported that Plaintiff was continuing to work full-time, but was complaining of severe daily headaches. (276). Plaintiff reportedly stated that he had "bad days" "50-60% of the time." (276).

On March 20, 2012, Miller began treating with Marc Schieber, M.D. ("Schieber"), a neurologist, who diagnosed post-concussive syndrome. Miller complained of continuous headaches, poor concentration and memory, lack of initiative and increased irritability. (330). Schieber diagnosed "ongoing post-concussive syndrome, and

prescribed medication for headaches, mood and concentration. (332).

On April 10, 2012, Miller reportedly told Schieber that the prescribed medication was helping with anxiety and sleep (319), and Schieber noted that Miller seemed "slightly more interactive" than before. (320).  However, Miler remained irritable and felt no affection for his family. (319).

On May 22, 2102, Miller told Schieber that his headaches were worse following a motor vehicle accident in which he sustained a whiplash-type injury. (309).  Although, there is no indication in the record that Miller ever sought medical treatment for such an injury.  Nevertheless, Schieber reported that Miller seemed "definitely more communicative" than before, was better groomed, walked more briskly, and was able to sit through the entire visit. (310).  Schieber prescribed Percocet for the headaches. (310).

On June 4, 2012, Abbott reported that Plaintiff had stopped working, and was complaining of "unrelenting" headaches.  Abbott noted that Plaintiff was "frustrated and tearful." (272).

On June 26, 2012, Miller told Schieber that his sleep and mood had improved with medication, but not his headaches. (364).  Schieber opined that Miller's headaches and problems with memory and attention prevented him from working. (365).

On June 28, 2012, neuropsychologist Dr. Damann performed an evaluation upon a referral from Schieber.  Damann administered a variety of tests to Miller, and diagnosed him with, *inter alia*, post-concussive syndrome, pain disorder associated with concusssion and psychological factors, cognitive deficits, anxiety disorder, and mood disorder. (263).  However, Damann indicated that it was difficult to assess Miller

6

because his test performance was inconsistent and may have been affected by various factors, including pain, emotional disturbance, the effects of prescription medications, "acute cannabis intoxication" (Miller told Damann that he smoked marijuana daily, and had smoked just before the examination, though he denied that he was "high"), and "secondary gain factors." (262) ("It is possible that Mr. Miller is experiencing legitimate cognitive impairment; however the inconsistencies preclude accurate assessment of this.  Therefore, Mr. Miller's cognitive impairment is thought to be more highly correlated with environmental, physical, and emotional factors, rather than significant organically-based brain damage.").  In any event, Damann opined that Miller's brain injury was "mild," and that his symptoms would improve. (262) ("Mr. Miller can be reassured that he will continue to experience improvement with his attention, memory, and processing speed, as the overwhelming majority of research suggests that resolution of cognitive symptoms generally occurs by 3 months post mild brain injury.").  Damann also recommended that Miller stop smoking marijuana, as it was "likely impairing his cognitive functioning and contributing to lack of initiation and hypersomnolence." (263).

On July 24, 2012, neuropsychologist Baer conducted an independent examination on behalf of Miller's employer's workers compensation carrier. (335-339). Baer's findings about Miller included the following: 1) his short term memory and ability to recall directions were "lost"; 2) he was anxious, depressed, irritable and felt sorry for himself; 3) he had poor reading ability; and 4) he appeared "confused and lost." Miller reportedly told Baer that he had a difficult childhood, and based upon such self-reporting Baer noted that "psychologically, [Miller] is a mess" and that "other psychological psychopathology exist[ing] in his life prior to brain injury" could be

contributing to his problems. (339).  Baer found no evidence that Miller was "malingering, faking, feigning, or looking for secondary gain." (337).  Nevertheless, Baer recommended that Miller undergo a full battery of testing that was even more exhaustive than what Damann had performed, in order to provide clearer results and rule out malingering. (339).

On July 31, 2012, Schieber reported that Miller seemed quite improved in certain respects. (300) (Noting that Miller was more animated, speaking in full sentences and making better eye contact).  However, Miller complained that his headaches were not improved by the prescribed medication. (299).

On August 10, 2012, Abbott reported that Miller's depression and headaches were somewhat improved, although still claimed to have headaches every day, and severe headaches three times per week. (268).  Miller told Abbott that he was feeling somewhat better, was performing daily chores around the house, was more engaged with his family and was visiting friends on a near-daily basis. (268).  Abbott decreased Miller's medications for depression, pain and seizures, since he thought that they might be interfering with his ability to concentrate.

On September 4, 2012, Schieber reported that Miller was still having headaches, but had stopped taking Morphine because he did not like the way it made him feel. (357).  Miller indicated that he was doing more chores around the house and had attended a concert with friends, though he generally felt stress around "large numbers of people." (357).  Schieber stated that Miller was "on the verge of tears" at times, but that his verbal expression was improved. (358).

On December 11, 2012, Abbott reported that Miller had stopped taking his

medications, and that "his tremor is resolved and his speech pattern has returned to normal.  He is performing chores around the house." (407).  Abbott stated that, "He has made some gains in overall functioning.  He remains with chronic headache occurrence[.]  [D]ifficulty  is really with depression and self imposed isolation." (407).  Abbott further stated that Miller was "continuing" to smoke marijuana on a daily basis: "He continues to smoke marijuana on a daily basis.  This helps his headaches." (407).

On January 17, 2013, Abbott reported that Miller was "doing somewhat better.  Headaches seem to be more manageable.  Mood seems improved.  He is looking forward to doing some part-time driving work." (408).  Indeed, Abbott encouraged Miller to "seek some part-time appointment," and filled out a "DOT physical form for CDL [commercial driver's license]" for Miller. (408-409).

On April 16, 2013, Abbott noted that Miller "still fe[lt] quite depressed" and had "[t]rouble with motivation." (411).

On April 28, 2013, Abbott reported Miller had "discontinued all his medications" because he did not think that they were helping, and had begun "using a holistic approach." (405).  Miller indicated that he still had "bad headache[s]," but that his mood had improved and he was "now active in yard work, shopping and housework." (405).  Abbott opined that Miller was "clearly improved off of medications." (406) ("He is engaging.  Mood is much improved.  Abnormal motor activity is absent today.").

On April 30, 2013, Abbott reported:  "He appears well.  He is moving easily in the exam room.  He is very talkative and engaging and seems quite upbeat today.  Affect is appropriate.  . . .  He seems to be doing better, at least today he is quite alert, talkative and engaging.  Much more animated than I have seen him."  (412).

On July 29, 2013, Abbott reported that Miller was sleeping much better, and felt "much less anxiety." (413).  Miller stated that his headaches continued but were "improved," and that he was continuing to smoke marijuana daily, purportedly for the headaches. (413).  Abbott stated:  "He is adhering strictly to a routine [of] chores around the house and daily activities.  He has renewed interest for prior hobbies and activities.  He feels that his mood is improved.  He is getting along well with his wife." (413).

On September 30, 2013, Abbott reported that Miller no longer felt depressed and was "active in the household":  "He is active in the household, taking care of his 2 children and doing most of the housework while his wife is employed at her business.  He has no trouble sleeping.  . . .  He does not feel anxious most of the day but at night has trouble with racing thoughts.  He does not like the way he feels with the clonazepam as it often makes him forgetful.  . . .  He has been smoking marijuana regularly as this is the only thing that has helped him with his headaches.  . . .  He does not like the fact that he has to smoke so often as the duration of action [the effect of the marijuana] is quite short.  He would like to try Marinol [THC] tablets." (414).

In connection with Abbott's treatment, on several occasions he completed forms for the New York State Workers' Compensation Board ("Workers' Compensation"), indicating that Miller was "100%" temporarily disabled.  For example, on February 19, 2012, June 8, 2012 and August 10, 2012, Abbott indicated that Miller was incapable of "any type of work." (269, 273, 276).  Similarly, on June 26, 2012, Schieber indicated that Miller was "100% temporarily disabled from any gainful employment." (306).

On January 22, 2013, Dr. Toor conducted a consultative neurologic examination

10

at the Commissioner's request. (382- 384). Curiously, despite Miller's decades-long use of marijuana, he reportedly told Toor that he had only tried marijuana once. (382) ("He denies any history of drug or alcohol use. He tried marijuana once[.]"). Miller reported having severe headaches "every day," sometimes lasting all day. (382). Miller also stated that he sometimes stayed in bed all day because he felt "stressed." (382). Miller told Toor that he did not cook, but cleaned the house and did laundry daily, assisted with childcare, showered and took care of his own needs, and spent his time watching television. (382). Miller reportedly stated that he had no hobbies, did not go out ("no outing") and did not socialize ("no socialization"). (382). Toor's examination essentially found no abnormalities, and in particular he found "[n]o indication of recent or remote memory impairment." (383). Toor further found that Miller's mood and affect were "appropriate." (383). Further, although Miller has claimed that he feels dizzy when he closes his eyes, Toor conducted a Romberg test that was negative. (383). Nevertheless, based on Miller's self-reporting, Toor opined that headaches could interfere with his daily routine and that dizziness could interfere with his balance. (384).

On February 26, 2013, psychologist Dr. Lin conducted a consultative psychiatric examination at the Commissioner's request. (385-388). As with Dr. Toor, Miller reportedly told Lin that he had no "drug history," despite his long-term use of marijuana. (386). Miller reportedly told Lin that he cooked, cleaned, bathed and groomed himself, went shopping when necessary, and drove occasionally. (387). Miller reportedly stated that he had a strained relationship with his family and did not socialize, preferring to stay in bed as a way to "cope." (387). Lin reported that Miller's "motor behavior was lethargic," and that his thought "processing speed appeared to be slow." (386). Lin

11

stated that Miller's attention, concentration and memory appeared to be impaired due to "reported cognitive change." (386).  Lin opined that Miller's cognitive functioning appeared to be "borderline," and that his insight and judgment were "fair." (387).  Lin stated that Miller could follow and understand simple instructions, learn new tasks and perform simple tasks with supervision. (387).  However, Lin stated that Miller could not maintain attention or concentration, and was "not able to maintain a regular schedule." (387).

On January 31, 2014, Miller and his attorney appeared at a hearing before an Administrative Law Judge ("ALJ"). (33-105).  Miller stated that the medications that he was taking at that time were mainly for depression. (68).  Miller stated that otherwise, he had generally stopped medications because "some of it had me absolutely out of my mind." (70).  Instead, Miller stated that he was taking a "wholistic approach" to his medical condition, which made him feel better. (69).   Miller testified that he had daily headaches, which last for hours. (88-89).  Miller stated that he had difficulty sleeping at night and got up many times each night. (71).  The ALJ asked Miller about his statement to Dr. Abbott that he used marijuana daily, *see* (407, 413-414), but Miller denied that he smoked marijuana daily, stating that it was only "periodically." (72).[3] With regard to memory and concentration, the ALJ asked Miller if he recalled Damann's examination, which occurred nineteen months prior to the hearing,[4] and Miller responded that he "remember[ed] the whole situation," including the type of shoes that

---

[3]Miller also reportedly told Damann that he used marijuana daily, with increased usage on weekends. (259).

[4]Damann examined Miller on June 28, 2012, while the hearing took place on January 31, 2014.

Damann was wearing. (82).  With regard to his ability to concentrate, Miller acknowledged that during Damann's evaluation, he had worked steadily through the three-hour examination, and had declined the opportunity to take breaks, but stated that he only did so because he wanted to finish the test quickly. (82) ("I just wanted to get done with it and over with it.").  As for activities of daily living, Miller stated that he does not cook or do any laundry. (77).  Miller stated that he occasionally drove to the store. (77).  Miller stated that earlier in the week he had gone to his wife's restaurant to deliver supplies, and that a friend had taken him to the supermarket. (79).  Miller stated that on another occasion a friend of his had driven him from Rochester to Canandaigua to visit with other friends prior to a concert. (81). Miller testfied that he drove a car only "periodically," because it scared him to do so. (47).

A vocational expert ("VE") also testified at the hearing.

On April 24, 2014, the ALJ issued a decision denying Miller's application for disability benefits.  In that regard, the ALJ followed the familiar five-step sequential analysis for disability claims and concluded, at step five, that Miller is not disabled.  At steps one, two and three of the sequential analysis, respectively, the ALJ found that Miller was not engaged in substantial gainful activity; that he had the following severe impairments: traumatic brain injury, obesity, anxiety disorder, adjustment disorder and cognitive disorder; and that none of those impairments, either separately or in combination, met or equaled the severity of a listed impairment. (12-15).  Next, the ALJ determined that Miller had the following residual functional capacity ("RFC"):

[Can] perform light work as defined in 20 CFR 404.1567(h) with the following additional limitations: The claimant cannot climb a rope, ladder

or scaffold, but he can occasionally stoop, balance on narrow, slippery or moving surface. He needs to avoid exposure to hazards -- open water, unprotected heights, but he can occasionally  drive. He can perform unskilled work with occasional changes in work setting. He requires up to three short, less than 5-minute breaks in addition to the regularly scheduled breaks. He can occasionally interact with [the] public, at DOT people function levels of 6 (speaking/signaling), 7 (serving), and 8 (helping/taking instruction). He cannot perform teamwork meaning no co-worker needs to wait for claimant to complete tasks before performing their tasks and the claimant does not need to wait for another to finish before performing own tasks. He can only occasionally make judgments or work-related discretionary decisions. He can work toward goals, but not at an hourly, machine driven, assembly line productions rate.

(15).  At step four of the sequential analysis the ALJ found, based on the VE's testimony, that Miller could not perform his past relevant work.  (20-21).  However, at step five of the sequential analysis, and based on testimony of the VE concerning a hypothetical claimant with the aforementioned RFC, the ALJ found that Miller could perform other work, including these jobs: Agricultural Produce Sorter (DOT # 529.687-186)and Small Products Assembler (DOT # 706.684-022).

Miller appealed, but the Appeals Council declined to review the ALJ's determination.

On August 10, 2015, Miller commenced this action.  Miller contends that the Commissioner's determination must be reversed for the following reasons:  1) the ALJ's determination was not supported by substantial evidence, since all of the medical opinions were essentially consistent and favored a finding of disability; 2) the ALJ did not apply the "treating physician rule"; 3) the ALJ failed to develop the record; 4) the ALJ did not properly assess his credibility; and 5) the ALJ erroneously relied upon the

Medical Vocational Guidelines ("the grids") to find him not disabled.[5]

The Commissioner opposes Miller's motion, and has cross-moved for judgment on the pleadings.

DISCUSSION

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Walker v. Bowen*, 660 F.Supp. 360, 362 (S.D.N.Y. 1987) ("The Secretary's findings of fact are binding on this Court so long as the claimant receives a fair hearing, no error of law is committed, and the findings are supported by 'substantial evidence' in the administrative record.") (Weinfeld, J.).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaal v. Apfel*, 134 F.3d at 501.

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

---

[5]At oral argument, Plaintiff's counsel attempted to raise an additional argument, which is that the jobs that the ALJ found Plaintiff could perform, at Step 5 of the sequential analysis, require abilities that exceed those contained in the ALJ's RFC determination.  However, the Court does not consider that argument since it was not included in Plaintiff's papers.

_Substantial Evidence and the Treating Physician Rule_

Plaintiff maintains that the ALJ's decision is not supported by substantial evidence, since _all_ of the medical evidence points toward a finding of disability.  In a related argument, Plaintiff contends that the ALJ failed to properly apply the treating physician rule.  The Court agrees with the second argument, but not with the first.

The Court understands Plaintiff's first argument to be that, even assuming that the ALJ committed no errors of law, there is simply not enough evidence to support a finding that Miller is capable of working on a sustained basis.  As noted above, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." _Schaal v. Apfel_, 134 F.3d at 501.  Here, the ALJ cited substantial evidence to support her finding that Miller is capable of working.  For example, the ALJ cited Miller's fairly extensive activities of daily living (13-14, 19, 20), the significant improvement of his symptoms over time (16-18, 20), his demonstrated ability to work and focus for hours at a time (14, 18, 20), his ability to obtain a commercial driver's license (17, 408-409) and the apparent over-statement of his mental impairments due either to his heavy use of marijuana/prescription medication, his tendency to "give up" quickly during testing or his unreliability as a historian (17-18, 20).  Accordingly, the Court denies this aspect of Plaintiff's motion.

As for Plaintiff's argument concerning the treating physician rule, the Second Circuit has provided a concise summary of the applicable law:

> The SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant. Thus, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' [*Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)] (quoting 20 C.F.R. § 404.1527(c)(2)). There are, of course, circumstances when it is appropriate for an ALJ not to give controlling weight to a treating physician's opinion. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (per curiam) (holding that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). Nevertheless, even when a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive. *See* 20 C.F.R. § 404.1527(c)(2)(i), (2)(ii), (3)–(6). "[T]o override the opinion of the treating physician, we have held that the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.2013) (per curiam). "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (alteration in original) (*quoting Halloran*, 362 F.3d at 33). The failure to provide " 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id*. at 129–30 (*quoting Snell [v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)]. The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion. *Id*. at 131.

*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).  An ALJ is not required to "slavishly" recite and discuss each factor contained in 20 C.F.R. § 404.1527(c), provided that "the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 Fed. Appx. 67, 70, 2013 WL 628072 at *2 (2d Cir. Feb. 21, 2013).

A treating physician is a "physician, psychologist, or other acceptable medical

source," who provides "medical treatment or evaluation" to a claimant as part of an "ongoing treatment relationship." 20 C.F.R. § § 404.1502 & 416.902.  A "nontreating source" is a "physician, psychologist, or other acceptable medical source" who has examined the claimant, but not as part of an ongoing treatment relationship. *Id*.

In Miller's discussion of the treating physician rule, he references the opinions of Abbott, Schieber, Baer, Damann, Lin and Toor, as if they were all treating physicians.[6] However, the Court finds that under the definitions set forth above, Miller's only treating physicians are Dr. Abbott and Dr. Schieber.[7]  Doctors Rodenhouse, Damann, Baer, Azurin, Lin, and Toor each examined Miller, but did not have an ongoing treatment relationship, and consequently they are nontreating sources.

Abbott and Schieber, on the other hand, have treated Miller for several years, and each has indicated that Miller is "100% temporarily disabled."[8] (19).  The ALJ's decision contains a boilerplate reference to the treating physician rule. ("I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527[.]").  However, several factors suggest that the ALJ did not consider the opinions of Schieber and Abbott in accordance with the treating physician rule.  To begin with, the ALJ never identified Schieber and Abbott as treating physicians under the regulations, or indicated that as such their opinions were entitled to special

---

[6]*See*, Pl. Memo of Law [#7] at pp. 14-15.

[7]At oral argument, Plaintiff's attorney agreed that there are only two treating physicians in this action.

[8]The Court agrees with Defendant that whether or not the claimant is "disabled" or "unable to work" is a determination for the Commissioner, and that the doctors' opinions should instead be expressed in terms of what the claimant can and cannot do.

consideration.  To the contrary, when the ALJ discussed the opinions of Schieber and Abbott, she lumped them together with the opinions of Baer, who is not a treating physician. (19).  Further, the ALJ indicated that she was giving only "some weight" to the opinions of Schieber and Abbott because they rendered their opinions in the context of New York State Worker's Compensation Law, whose definition of disability is different than the Commissioner's.  In particular, the ALJ stated, "opining that the claimant is disabled pursuant to Worker's Compensation law may mean that [the] doctor finds that the claimant cannot perform his past work.  While the claimant may be precluded from past work, that is not the standard for disability here." (19).  However, the ALJ's finding on this point was erroneous because it overlooked the fact that both Schieber and Abbott indicated that Miller was, at least temporarily, incapable of performing *any* gainful full-time employment. *See*, (365, 366) (Schieber: Patient is "100% temporarily disabled from any gainful employment."); (403) (Abbott: Patient unable to "do any type of work.").[9]

Moreover, even where a treating source expresses an opinion on an issue reserved to the Commissioner, such as whether a claimant is "disabled," the ALJ cannot simply ignore or disregard the treating source's opinion. In that regard, the Commissioner has stated as follows, in pertinent part:

> [O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules

---

[9]Although, Abbott later encouraged Miller to go back to work part-time, and apparently gave his approval for Miller to obtain a commercial driver's license ("CDL"). (408-409).  In that regard, Abbott completed a "DOT physical form for CDL," which is not currently part of the record, but which would presumably be helpful to have as evidence. (*Id.*).

also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us. . . . [T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.

***

However, opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

***

[For example,] [m]edical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. . . . Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

Titles II & Xvi: Med. Source Opinions on Issues Reserved to the Comm'r, SSR 96-5P (S.S.A. July 2, 1996).  Here, while it does not appear that the ALJ "disregarded" the opinions of Abbott and Schieber, it is unclear whether she followed this rule.  On remand, the ALJ should clarify the weight that she gave to the opinions of Abbott and Schieber, and how she evaluated their opinions that Miller was (temporarily) unable to work at any job.  In doing so, it may be necessary for the ALJ to seek clarification from Abbott and Schieber. *See*, SSR-96-5p ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's

opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").

## Development of the Record

Plaintiff further contends that the ALJ failed to develop the record.  It is clear that an ALJ is required to develop the administrative record where there are "clear gaps." See, Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999)("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").  Here, Plaintiff contends that if the ALJ was not going to give controlling weight to the opinions of Abbott and Schieber, she was "under an absolute obligation to re-contact said physicians to seek clarification"[10] of their opinions pursuant to  20 C.F.R. § 404.1512(e).  However, the version of 20 C.F.R. § 404.1512(e) which Plaintiff cites for that proposition was repealed, effective March 26, 2012. See, 77 Fed. Reg. 10651-01, 2011 WL 7404303 (Feb. 23, 2012) ("We are modifying the requirement to recontact your medical source(s) first when we need to resolve an inconsistency or insufficiency in the evidence he or she provided.").  Consequently, this aspect of Plaintiff's application is denied.

## The Assessment of Miller's Credibility

Miller further contends that the "ALJ improperly determined that the [he] was not

_____

[10]Pl. Memo of Law [#7] at p. 16.

disabled solely based upon her observations [of him] at the hearing."[11]  However, that assertion is puzzling since the ALJ's decision does not mention any such observations. On the other hand, as referenced in the ALJ's decision, the record is replete with inconsistent statements by Miller that undermine his credibility.  For example, as discussed above, Miller's reported statements to Toor and Lin about his daily activities (cooking, cleaning, driving, yard work, socializing), as well as his hearing testimony about those activities, are inconsistent with statements that he made to Abbott, particularly in late 2012 and 2013.  Miller also reportedly hid his heavy marijuana usage from Toor and Lin, which is significant inasmuch as they were attempting to determine the nature and  extent of his cognitive impairments.  If Toor and Lin had known that Miller was a frequent marijuana user it might well have affected their opinions.  Indeed, Damann had already observed that Miller's poor test performance might have been caused by acute cannabis intoxication.  Furthermore, while Miller claims to have significant problems with memory, he was able to recall what type of shoes Damann was wearing when she examined him nineteen months earlier.  Accordingly, to the extent that the ALJ made a negative credibility finding,[12] there was substantial evidence of record to support the finding.

Plaintiff nevertheless contends that the ALJ failed to properly consider evidence supporting his credibility, such as his consistent attempts to obtain treatment or his

---

[11]Pl. Memo of Law [#7] at p. 16.

[12]The ALJ was actually quite charitable in her assessment of Miller's credibility, since although she found that Miller exaggerated some of his symptoms, she indicated that such exaggeration might well have been unintentional. (20) ("I do not find evidence of intentional distortions."); *see also* (18) (referring to Miller's "perception of his limitations.").

favorable work history, including the fact that he continued to work following his initial

head injury.  However, the Court disagrees and notes, for example, that the ALJ

specifically referenced Miller's "significant work history" as supporting his credibility.

(20).  Consequently, this aspect of Plaintiff's motion is denied.

### *The ALJ's Determination at Step Five of the Sequential Analysis*

Lastly, Miller contends that the ALJ erred, at step five of the sequential analysis,

in various ways.  Miller first argues that if the ALJ had properly evaluated the medical

evidence she would have concluded that he was incapable of a full range of sedentary

work and therefore would have had to find him disabled "pursuant to 20 C.F.R. Part

404, [Subpart P,] Appendix 2, § 201.00(h) and Social Security Ruling 96-9p."[13]  To the

extent that Miller is suggesting that there was not substantial evidence of record to

support a finding that he was capable of light work, the Court disagrees.  However, as

already discussed the matter is being remanded due to the ALJ's failure to properly

apply the treating physician rule.

Miller also contends that the ALJ erred by finding him not disabled based on an

application of the grids, 20 C.F.R. Part 404, Subpart P, Appendix 2 § 202.18.  That

argument, though, also lacks merit, since the ALJ did not actually rely on the grids at

step five of the sequential analysis.  To the contrary, the ALJ stated that she could not

use the grids since Plaintiff was restricted to less-than-the-full-range of light work. (21).

Instead, the ALJ relied on the testimony of the VE.

Miller further contends that the VE testified that there were"no jobs [that he]

---

[13]Pl. Memo of Law [#7] at p. 19.

could perform."[14]   However, that assertion is also incorrect,[15] since the VE actually indicated that based on the ALJ's RFC finding, there were other jobs that Plaintiff could perform. (100-103).

CONCLUSION

Defendant's cross-motion [#12] for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings [#7] is granted, though his request to have the matter remanded solely for calculation of benefits is denied.[16]   The matter is reversed and remanded to the Commissioner for further administrative proceedings. The Clerk of the Court is directed to enter judgment in Plaintiff's favor and to close this action.

So Ordered.

Dated: Rochester, New York
      May 17, 2016                          ENTER:


                                            /s/ Charles J. Siragusa
                                            CHARLES J. SIRAGUSA
                                            United States District Judge

---

[14]Pl. Memo of Law [#7] at p. 21.

[15]The VE initially indicated that there were no such jobs, but that answer was based on a misunderstanding of the question.  Once the ALJ clarified the question, the VE indicated that there were jobs that Plaintiff could perform.

[16]Although Plaintiff's motion includes a demand to have the case remanded solely for calculation of benefits,  he has not shown that such relief is appropriate in this case.   As discussed above, the record contains substantial evidence from which the ALJ could conclude on remand that Plaintiff is not disabled.